UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. 12-50111-JLV |
| | ) | |
| Plaintiff, | ) | |
| | ) | **REPORT AND** |
| vs. | ) | **RECOMMENDATION ON** |
| | ) | **DEFENDANT'S MOTIONS TO** |
| GEORGE AMERICAN HORSE, | ) | **SUPPRESS** |
| | ) | [DOCKET NOS. 36 & 51] |
| Defendant. | ) | |
| | ) | |
| | ) | |

## INTRODUCTION

Defendant George American Horse is before the court on an Indictment charging him with one count of aggravated sexual abuse of a minor in violation of 18 U.S.C. §§ 1153, 2241(c), and 2246(2)(B). He moves to suppress statements he gave to law enforcement on June 21, 2012, and on August 13, 2012. See Docket Nos. 36 and 51. The government opposes both motions in their entirety. See Docket Nos. 44 and 59. The district judge, the Honorable Chief Judge Jeffrey L. Viken, has referred both motions to this magistrate judge for the holding of an evidentiary hearing and issuing a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

**FACTS**

An evidentiary hearing was held on defendant's motions on Friday, May 10, 2013, at 9:00 a.m. Present at the hearing were Mr. American Horse and his counsel, George Grassby. Present on behalf of the government was Assistant United States Attorney Wayne Venhuizen. At the hearing, testimony and documentary exhibits were introduced into evidence. From this evidence, the court finds the following facts.

**A.    The June 21, 2012 Statement**

A.D., a six-year-old female child, told her school counselor that her grandfather, defendant George American Horse, had sexually abused her. A tribal child welfare organization was notified, and subsequently made a referral to Special Agent George Dobberstein with the Federal Bureau of Investigation.

A.D. was twice interviewed forensically by someone other than Agent Dobberstein. During those interviews, A.D. disclosed that Mr. American Horse had made her give him oral sex on one occasion when they were living in the same house at a farm near Batesland, South Dakota. Agent Dobberstein then made plans to interview the defendant.

Mr. American Horse was known to a colleague of Agent Dobberstein's, FBI Agent James Michael Baas, as Agent Baas had met the defendant in an unrelated investigation being conducted by Agent Baas. Agent Baas was on a first-name basis with the defendant and the two had exchanged cell phone

numbers with each other. Agent Dobberstein asked Agent Baas to set up a meeting with Mr. American Horse and to accompany him to that meeting.

The two FBI agents traveled to the Pine Ridge Indian Reservation on June 21, 2012, to conduct an interview with Mr. American Horse at his home. When the agents arrived at the defendant's home, he was absent. Agent Baas called Mr. American Horse on his cell phone. Mr. American Horse indicated that he was a short distance away, doing some mechanic work on someone's vehicle. He told Agent Baas where to drive to in order to find him. The agents went to that location and, upon arrival, encountered Mr. American Horse standing out in the street waiting for them in a residential area.

The agents pulled up to the curb in their vehicle, a white, unmarked sport utility vehicle with no cage on the interior. Mr. American Horse approached the vehicle and Agent Dobberstein exited the front passenger seat, greeted Mr. American Horse, and offered his seat to Mr. American Horse. Mr. American Horse entered the vehicle and sat in the front passenger seat. Agent Dobberstein closed the door behind him and took a seat in the center of the back seat of the vehicle. Agent Baas was in the driver's seat.

Agent Baas and Agent Dobberstein both testified that at the beginning of the meeting, Agent Baas reached across Mr. American Horse and demonstrated to him that his car door was unlocked and also demonstrated how to open the door. Mr. American Horse testified that Agent Baas did not perform this

demonstration until the end of the interview.  In any case, the testimony of all three men agreed that the window on Mr. American Horse's passenger door was rolled all the way down as it was a warm day.  The window on Mr. American Horse's door remained down for the entirety of the interview.  Agent Baas also testified that his own driver's side window was also down for the entirety of the interview.

Both agents were in casual dress–jeans, a tee-shirt, and an untucked shirt over the tee-shirt.  Although both agents wore their weapons on their bodies, the weapons were never displayed as their outer shirt covered the weapons at all times.  Mr. American Horse was never handcuffed or restrained physically in any way.

The agents observed no signs of intoxication on Mr. American Horse.  He had no odor of alcohol on his person in the close, warm environment of the vehicle.  He did not slur his words.  His gait appeared steady as he approached the agents' vehicle.  Mr. American Horse's responses throughout the interview were appropriate, indicating that he understood what the agents were saying to him.  The agents did not ask Mr. American Horse to submit to a preliminary breath test.

At the beginning of the interview, the agents told Mr. American Horse that they wanted to talk to him about "a few things."  They did not specifically inform him that they were there to discuss A.D.'s allegations.  Agent

Dobberstein immediately told Mr. American Horse that he was free to leave, that the interview was entirely voluntary and that he could refuse to talk to the agents, and could also refuse to answer any question he did not want to answer even if he agreed generally to talk to the agents. Agent Dobberstein told the defendant that he was not under arrest and would not be arrested that day. Agent Dobberstein told Mr. American Horse he was free to leave, right then or at any time. The defendant agreed that Agent Dobberstein advised him of these things.

In response to these advisements, Mr. American Horse did not ask to leave, did not try to leave, and did not in any other way indicate a desire not to talk to the agents. The tone of the interview throughout was conversational and somewhat subdued. Agent Dobberstein was conscious of the fact that the windows on the vehicle were rolled down and that passersby were coming and going in near proximity to the agents' vehicle. Agent Dobberstein kept his voice lower so as not to be overheard by anyone outside the vehicle.

The interview began with small talk. Both agents said they used an interview technique called "rapport building," which is a technique intended to create a connection between interviewer and interviewee and to put the interviewee at ease and in a relaxed state. Both agents indicated that they did not interview Mr. American Horse in an abrasive, accusatory, aggressive manner as that tends to induce interviewees to "clam up" and refuse to talk.

Agent Baas began the interview by asking Mr. American Horse if he had ever gone by the name "Gerald" American Horse. The defendant, whose first name is "George," replied that he had never gone by the name "Gerald." He informed the agents that Gerald was his brother. He then volunteered that Gerald had been convicted of child sexual abuse and was sentenced to 20 years in the penitentiary.

The agents then asked Mr. American Horse if he had ever abused A.D. Mr. American Horse denied doing so. After some conversation, Agent Dobberstein confronted Mr. American Horse with the specific allegations made by A.D. These allegations were very specific as to what body part on the defendant came into contact with what body part on A.D., and the fact that the defendant then ejaculated. However, other details of A.D.'s statement were not given to the defendant. Agent Dobberstein asked Mr. American Horse how A.D. would know about these things if they were not true as she was too young to have any independent knowledge of sex.

Mr. American Horse's first response to this was to say "I can't remember if I did it. If I did, I'm sorry."

Even though this passage in the interview was a confrontation of sorts, there was no yelling, no raised voices, no leaning into Mr. American Horse's physical space, and no restraints. The agents did not promise, threaten, or coerce Mr. American Horse into making this statement. At one point,

Mr. American Horse became agitated and Agent Baas reached out and very briefly patted his leg two or three pats near the defendant's knee while saying "George, it's ok, just relax." This physical touch was brief, lightly made, and did not venture anywhere near Mr. American Horse's upper thigh or groin.

Even after the "confrontation," Mr. American Horse never asked to leave, never said he wanted to leave or quit the interview, and never made any physical gesture toward that end. He kept talking to the agents.

After Mr. American Horse made his initial statement, he then talked to the agents in detail about what had happened. He told them what building the events took place in, the approximate time of night, where he was in the room, where A.D. was in the room, what he had been doing immediately before the event, where A.D. was, and how Mr. American Horse touched her during each progression of the event. The agents testified that during this detailed part of Mr. American Horse's confession, the defendant supplied all the details. The agents did not suggest these details to Mr. American Horse.

Significantly, Agent Baas testified that he learned several new facts from Mr. American Horse about the abuse that he had not previously known. During this portion of the interview, Agent Dobberstein testified that he just asked open-ended questions like "Then what happened?" and "What next?" Both agents denied supplying the details that Mr. American Horse told them

about.  Mr. American Horse, testifying at the hearing, said that he just repeated details that the agents told him to agree to.

After Mr. American Horse made his initial confession, Agent Dobberstein told the defendant that sometimes victims of sexual abuse find it easier to heal if they have an apology from the abuser.  He asked Mr. American Horse if he would like to write an apology letter to A.D.  Mr. American Horse agreed to that.

The agents gave the defendant a pad of paper and a writing instrument and he wrote to A.D. that he knew he had made A.D. "do a bad thing."  Agent Dobberstein read the statement and suggested that the apology was kind of vague and did not make entirely clear the conduct for which he was sorry.  Agent Dobberstein suggested that Mr. American Horse add another sentence stating explicitly the nature of the act for which he was sorry.  Mr. American Horse then did so.  The letter was introduced at the hearing as Exhibit No. 1.  Testifying at the hearing, Mr. American Horse stated that the entire apology letter was dictated by the agents and he merely wrote down what they told him to write.

After Mr. American Horse wrote his apology letter to A.D., Agent Dobberstein asked him if he would make a tape-recorded recap of his statement.  Agent Dobberstein emphasized that Mr. American Horse should use his own words to tell his own side of the story.  He also emphasized that

making the taped statement was entirely voluntary–that the defendant did not have to do so if he did not want to. Mr. American Horse agreed to do so.

Agent Dobberstein placed the recording device in the front seat on the center counsel in between the defendant and Agent Baas. The defendant then made a taped statement, introduced at the hearing as Exhibit No. 2. In the statement, he repeated a summary of the sexual abuse involving A.D. At the end, Agent Dobberstein asked a couple of clarification questions. Agent Dobberstein gave Mr. American Horse the opportunity to add anything he wanted to add to explain or clarify.

In the taped statement, Mr. American Horse's voice sounds very matter-of-fact and unemotional, but not at all a "flat" affect. He expressed regret, but stated that he had been drinking and portrayed A.D. as the initiator whose actions "aroused" him and "one thing led to another." He talked about a third party, Trent, who had perhaps abused A.D. or spoken to her about sex prior to the event, unbeknownst to the defendant, and may have told A.D. to perform oral sex on the defendant. The defendant's voice does not sound stressed, emotional, quavering, tearful, angry, emotional or overwrought in any way. It is a simple recitation of facts in a normal tone of voice.

At the end of the interview, which lasted in its entirety for approximately one hour from the time Mr. American Horse entered the vehicle, Mr. American Horse then exited the vehicle. He went on his way and the agents left to go

their own way.  Mr. American Horse was not arrested or told to keep the agents apprised of his location nor was he told not to leave the state or the country.

Both of the FBI agents were Caucasian.  Mr. American Horse is Native American.  Both FBI agents were physically larger than Mr. American Horse in height and weight.

**B.     August 13, 2012 Statement**

Mr. American Horse was indicted on the instant offense on July 24, 2012.  An arrest warrant was issued for his arrest the next day.  At the time, Mr. American Horse was in jail in Rushville, Nebraska, serving out a sentence for a conviction for driving while under the influence of alcohol.  Agents Dobberstein and Baas waited for his 15-day state sentence to expire and then traveled to Rushville to arrest Mr. American Horse on the federal warrant in this case.

Upon arrival at the Rushville jail on August 13, 2012, the agents were required to check their weapons before entering, which they did.  They then took custody of the defendant and retrieved their weapons on the way out of the jail.  The agents were dressed as before.  Mr. American Horse may have seen their weapons briefly as they retrieved them and holstered them.  Otherwise, the agents' weapons were concealed and not displayed during the entirety of their contact with Mr. American Horse.

The agents told Mr. American Horse that he had been indicted and was being arrested on the indictment.  Agent Dobberstein read out loud to

Mr. American Horse an advice of rights form, Exhibit No. 3. The following is a verbatim recitation of the rights set forth under the heading "YOUR RIGHTS" on Exhibit 3:

> Before we ask you any questions, you must understand your rights.
>
> You have the right to remain silent.
>
> Anything you say can be used against you in court.
>
> You have the right to talk to a lawyer for advice before we ask you any questions.
>
> You have the right to have a lawyer with you during questioning.
>
> If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
>
> If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

See Exhibit 3.

After reading the form out loud, Agent Dobberstein then gave the form to Mr. American Horse and asked him to read it to himself. Agent Dobberstein asked Mr. American Horse to initial each statement of each right as he read them if he understood the right. Mr. American Horse initialed each statement of a right on the form. See Exhibit 3.

After doing so, Agent Dobberstein asked Mr. American Horse if he understood his rights. Mr. American Horse said he did. Agent Dobberstein then asked him if he would agree to waive his rights and talk to the agents.

Mr. American Horse indicated that he would waive his rights.  Exhibit 3 stated as follows regarding the waiver:  "WAIVER OF RIGHTS  I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present."  See Exhibit 3.  At that point, Agent Dobberstein, Agent Baas, and Mr. American Horse executed the waiver of rights form by signing and dating it.[1]

The vehicle the agents were driving this time was an unmarked black sport utility vehicle.  Mr. American Horse was placed in handcuffs, with his hands in front of his body.  As the three began their journey to Rapid City, South Dakota, Agent Dobberstein asked Mr. American Horse if it would be okay if they detoured slightly from a direct route so that the three men could make a site visit to the farm where the sexual abuse that Mr. American Horse had described in June took place.  The agents explained that they wanted to make a site visit so that the defendant could point out the building in which the abuse had taken place, since there were multiple buildings on the farm. The detour would mean adding an additional 23 miles to a trip that would otherwise have been 133 miles.  According to the agents, Mr. American Horse assented to the detour.  At the hearing in this matter, Mr. American Horse

---

[1]Agent Dobberstein, when inserting the date on the upper right hand corner of the form, inadvertently listed the year as "11" when in fact the year was 2012. He acknowledged that this was a mistake at the hearing.

testified that the agents did not ask his preference about the detour but simply drove to the farm without asking him.

Once at the farm, all three men exited the vehicle. Mr. American Horse was left in handcuffs. He was allowed to walk about freely. He led the agents to a camping-style trailer located in a shed and said that the trailer was where he had received oral sex from A.D. When Mr. American Horse testified at the hearing in this matter, he denied reaffirming this incriminatory statement at the farm, although he did not deny identifying the trailer for the agents. All three men immediately got back into the agents' vehicle and they drove on to Rapid City. The entire stop at the farm took approximately 10 to 15 minutes.

The agents' tone on August 13, 2012, was again cordial and conversational. There were never any threats or promises made. There was no physical contact whatsoever or any invasion of the defendant's physical space. Mr. American Horse never expressed any reluctance to talk nor did he try to invoke his rights in any way once having waived them.

## C.    Dr. Manlove's Opinion

Dr. Manlove was hired by the defense to provide an opinion in this case as to whether Mr. American Horse's confession was "false." Dr. Manlove interviewed Mr. American Horse on two occasions and reviewed discovery and file materials provided to him by the defense. Dr. Manlove opined that Mr. American's Horse's statement "may" be false.

Dr. Manlove based his opinion on the fact that the interview took place in a police-owned vehicle, the defendant told the FBI agents he did not remember, the defendant told Dr. Manlove that the agents then fed him facts about the allegations, one agent put his hand on the defendant's leg which upset the defendant, and the agents tried to "normalize" the sexual abuse allegations, making it easier to admit. A final factor Dr. Manlove relied upon in coming to his conclusion that the statement "may" be false was the "power imbalance" between the agents and Mr. American Horse. The "power imbalance" was created because the officers were police with the power to arrest, Mr. American Horse was smaller and a member of a racial minority, and Agent Baas touched Mr. American Horse's leg, which Dr. Manlove testified increased the defendant's anxiety and desire to escape the situation.

Dr. Manlove admitted that his interviews with the defendant came after he was indicted and that this may have given Mr. American Horse an incentive to fabricate. Psychological testing done by a colleague showed that Mr. American Horse was normal. He graduated from high school, served four years in the United States Navy and was honorably discharged, had no family history of mental illness, and the defendant himself had no sign of mental illness save for alcoholism. The defendant could read and write English, had never attended special education classes, and had no learning problems that were disclosed by him or apparent during the interviews or testing.

When Dr. Manlove explained that the interviews and report would not be kept confidential, Mr. American Horse understood the concept of non-confidentiality.  Mr. American Horse was able to explain the concept back to Dr. Manlove in his own words.  Mr. American Horse told Dr. Manlove that he had not been drinking prior to the FBI interviews, he was not under the influence of alcohol at the time of the interviews, and he was not withdrawing from alcohol at the time of the FBI interviews.

Mr. American Horse told Dr. Manlove that the agents had not used or displayed any weapons during the interviews, had not restrained him in any way, and did not use any kind or threat of physical force.   Dr. Manlove testified that Mr. American Horse had a criminal history consisting of two arrests or convictions for disorderly conduct and approximately ten such arrests or convictions for driving while under the influence of alcohol.

When Dr. Manlove asked Mr. American Horse if he sexually abused A.D., he initially responded that "I would say there wasn't any" sexual abuse.  Later in the interview with Dr. Manlove, Mr. American Horse amended this statement so as to unequivocally deny that any sexual abuse took place.

At the evidentiary hearing in this matter, the court explained to Dr. Manlove that whether Mr. American Horse's statement was true or false was not the focus of the motion to suppress.  Rather, the court explained, the court was being asked to determine whether the statement was voluntary or

coerced.  The court explained that the salient question was whether the action of the police amounted to coercion that overbore Mr. American Horse's free will.

Dr. Manlove opined that there are different ways of overbearing one's will.  He stated that there was no overt, physical coercion in this case. However, he testified that, in a psychiatric sense, the police did limit Mr. American Horse's free will.  The example Dr. Manlove gave was when a child gets into trouble, the parent confronts the child with the wrongdoing and gives them two choices as punishment: punishment A or B.  In so doing, the parent has–in Dr. Manlove's opinion–overcome the child's free will.

As an initial matter, the court notes that Dr. Manlove is not a lawyer and, thus, his opinion as to free will is not a legal opinion.  Further, the example used by Dr. Manlove convinces the court that his psychiatric concept of free will and the circumscription thereof, does not correlate to the legal question as to the voluntariness of a statement.  Therefore, although the court takes Dr. Manlove's opinion into consideration in the analysis below concerning the voluntariness of Mr. American Horse's statements to the police, the court does not find Dr. Manlove's opinion to be determinative of the issue.

**D.      Mr. American Horse's Testimony**

Finally, before moving on to the analysis of the legal issues in these motions, the court makes a specific finding that Mr. American Horse's testimony was not credible.  While testifying, Mr. American Horse responded in large part to leading questions by his counsel.  His responses were

monosyllabic for the most part.  He contradicted himself numerous times.  For example, he testified on direct that he thought he was not free to go at the June 21, 2012, interview.  Then he testified on cross-examination that he knew he was free to go during that interview and admitted that the agents told him so.  Then, on re-direct, he again asserted that he thought he was not free to go.

Mr. American Horse did admit on cross-examination that he approached the agents' vehicle voluntarily on June 21, 2012, that no one threatened him, pushed him, or restrained him.  He characterized the interview as a "conversation."  He admitted that his door remained unlocked and his window on that door was down during the entirety of the interview.

Mr. American Horse testified that the entirety of the apology letter was dictated to him by the agents and that he merely transcribed what he was told to write.  This is not credible as the first portion of the letter is very vague and not helpful as evidence to incriminate Mr. American Horse–the court does not believe that the FBI agents, seeking to incriminate Mr. American Horse, told him to write that he had made A.D. "do a bad thing."  This was clearly Mr. American Horse who chose those words.  And Agent Dobberstein freely admitted that he asked the defendant to be more specific and to write the last sentence of the letter by stating exactly what the "bad thing" was.

Mr. American Horse testified that the agents fed him all the details that he confessed to regarding the sexual abuse of A.D.  But the agents testified

that they learned new details of the event from Mr. American Horse during his confession than they had known prior to June 21, 2012. If the agents were the source of all the information recited by Mr. American Horse, it would not be possible for them to be surprised by hearing new details.

Finally, although Mr. American Horse claims he was "scared" and "shocked" by the allegations of sexual abuse by A.D. and that he admitted to those allegations because of his emotional state, the court notes that he admitted or failed to deny those allegations on at least two other occasions when he was not in an emotionally overwrought state.

When the agents arrested Mr. American Horse on the warrant in this case in August, 2012, he again admitted to the allegations after a full advisement of <u>Miranda</u> rights. Also, when Dr. Manlove interviewed him–in November, 2012, long after the novelty of the allegations first aired in June should have worn off–he did not immediately deny the allegations. Instead, he again responded in a manner that was not a clear and unequivocal denial by saying "I would say that there wasn't any" sexual abuse. For all these reasons, the court finds Mr. American Horse's testimony at the evidentiary hearing to lack credibility.

## DISCUSSION

Mr. American Horse now moves to suppress both of his statements. As to the June 21, 2012, statement, Mr. American Horse argues that he was in custody while being interrogated and that the officers should have given him

Miranda warnings.  As to the August 13, 2012, statement, although Miranda

warnings were given, Mr. American Horse argues that the advisement of rights

was inaccurate and incomplete.  He also argues that he never effectuated a

valid waiver of his Miranda rights as to the August statement.  Finally,

Mr. American Horse argues that both statements were involuntary.

## A.    June 21, 2012, Statement

### 1.    Whether Miranda Warnings Were Required

The holding in Miranda "is that an individual must be advised of the

right to be free from compulsory self-incrimination, and the right to the

assistance of an attorney, any time a person is taken into custody for

questioning."  United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990)

(citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)).  Miranda warnings

protect an individual's Fifth Amendment privilege against self-incrimination by

"ensuring that a suspect knows that he may chose not to talk to law

enforcement, to talk only with counsel present, or to discontinue talking at any

time."  Colorado v. Spring, 479 U.S. 564, 574 (1987).  A Miranda warning is

required prior to questioning whenever two conditions are present:  (1) the

suspect is being interrogated and (2) the suspect is in custody.  United States

v. Flores-Sandoval, 474 F.3d 1142, 1146 (8th Cir. 2007); Griffin, 922 F.2d at 1347; United States v. Carter, 884 F.2d 368, 370 (8th Cir. 1989).

Neither party disputes that Mr. American Horse was interrogated. The only question to decide in determining whether Miranda warnings should have been given is whether Mr. American Horse was "in custody." Some courts have placed the burden of proving that the defendant was not in custody at the time of the interrogation on the government. See United States v. Charbonneau, 979 F. Supp. 1177, 1181 (S.D. Ohio 1997) (government bears the burden of proof that Miranda warnings were not necessary). Other courts have placed the initial burden on the defendant to prove that he was "in custody," with the burden of proof shifting to the government to prove a voluntary waiver only after the defendant has sustained his initial burden. See United States v. Moore, 104 F.3d 377, 392 (D.C. Cir. 1997). The Eighth Circuit appears not to have addressed this issue yet, although some district courts within the circuit have. See e.g. United States v. Morriss, No. 06-6010-01, 2006 WL 3519344 at *12 (W.D. Mo. Dec. 6 2006) (placing initial burden on defendant and citing to extra-circuit cases for authority). For purposes of this report and recommendation, the court has placed the burden on the government to prove that Mr. American Horse's statements were *not* the subject of custodial interrogation.

A suspect is considered to be "in custody" either upon his formal arrest or "under *any other circumstances* where the suspect is deprived of his freedom of action in *any* significant way." Griffin, 922 F.2d at 1347 (citing Berkemer v. McCarty, 468 U.S. 420, 429 (1984); Miranda, 384 U.S. at 444) (emphasis in original). Absent formal arrest, a suspect is deemed to be "in custody" where a reasonable person in the suspect's position would have believed that his freedom of action had been curtailed to a "degree associated with formal arrest." Berkemer, 468 U.S. at 440 (internal citation omitted); United States v. Black Bear, 422 F.3d 658, 661 (8th Cir. 2005); Griffin, 922 F.2d at 1347; Carter, 884 F.2d at 370. "Two discrete inquiries are essential to the [in custody] determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112 (1995). In determining whether a suspect reasonably believed himself to be in custody, the court examines the totality of the circumstances. Carter, 884 F.2d at 370 (citing United States v. Lanier, 838 F.2d 281, 285 (8th Cir. 1988) (per curiam)). The test is one of objective reasonableness judged from the point of view of the suspect, not from the point of view of the interrogator. Berkemer, 468 U.S. at 442; Black Bear, 422 F.3d at 661; Griffin, 922 F.2d at 1347; Carter, 884 F.2d at 370.

Under the totality of the circumstances test, six nonexclusive factors have emerged with some frequency: (1) whether the suspect was informed that he was free to leave and that answering the interrogator's questions was voluntary; (2) whether the suspect possessed freedom of movement during the interrogation; (3) whether the suspect initiated contact with the interrogator or voluntarily acquiesced in the interrogation; (4) whether the interrogator employed strong-arm tactics or strategies; (5) whether the atmosphere of the interrogation was dominated by the police; and (6) whether the suspect was arrested at the close of the interrogation. See United States v. Flores-Sandoval, 474 F.3d 1142, 1146-1147 (8th Cir. 2007) (citing Griffin, 922 F.2d at 1349). The first three factors are "mitigating factors which, if present mitigate against the existence of custody at the time of questioning." United States v. Axsom, 289 F.3d 496, 500-01 (8th Cir. 2002). The last three factors are "aggravating factors which, if present, aggravate the existence of custody." Id. at 501.

Reference to these factors is helpful, but these factors are not exclusive and custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." Flores-Sandoval, 474 F.3d at 1147. The factors are not to be ritualistically applied. United States v. Brave Heart, 397 F.3d 1035, 1039 (8th Cir. 2005). While not determinative, other pertinent facts to consider are the place where the interrogation took place, the purpose of the interrogation, the length of the

interrogation, and any other relevant factors should also be considered.

Griffin, 922 F.2d at 1348; Carter, 884 F.2d at 370.

Courts have given substantial weight to an interrogator's advising a suspect that no arrest is being made or will be made at the time of questioning, and that the suspect is free to decline to answer questions or to terminate the interrogation at any point the suspect so chooses. "The most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." United States v. Czichray, 378 F.3d 822, 826-27 (8th Cir. 2004) (citing Griffin, 922 F.2d at 1349). Although the Griffin factors are by no means exhaustive and should not be applied "ritualistically," nevertheless, the Griffin factors continue to appear in Eighth Circuit case law and continue to be cited with approval for determining the custody issue. See, e.g. United States v. Plumman, 409 F.3d 919, 924 (8th Cir. 2005).

Finally, whether a suspect was the focus of an investigation at the time the interrogation takes place is of little significance unless that fact was communicated to the suspect and that fact contributed to the suspect's reasonable conclusion of not being free to go. Griffin, 922 F.2d at 1348; Carter, 884 F.2d at 370 (citing United States v. Jimenez, 602 F.2d 139, 145 (7th Cir. 1979)).

23

In United States v. Johnson, the Eighth Circuit found that a suspect was not "in custody" during interrogation, even though the suspect was in the back seat of a patrol vehicle. United States v. Johnson, 64 F.3d 1120, 1126 (8th Cir. 1995). In Johnson, the suspect was a passenger in a vehicle that police stopped. Id. at 1122-23. A plain clothes police officer asked Johnson, who was then standing nearby the stopped vehicle on the curb, if they could talk in the back seat of a squad car. Id. at 1123. Johnson agreed to do so. Id. He was not handcuffed and he was not advised of his Miranda rights. Id. The plain clothes officer told Johnson he was not under arrest. Id.

In finding that Johnson was not in custody when he was questioned at the scene of the stop in the back of the patrol vehicle, the Eighth Circuit emphasized that Johnson was told he was not under arrest. Id. at 1126. Also relevant to the court's decision were the facts that Johnson was not handcuffed or otherwise restrained, nor was he isolated from the others he had been traveling with in the vehicle. Id. Although the contact with Johnson had been initiated by police, no strong arm tactics were used and the questioning was straightforward. Id. Finally, the court noted that the police officer questioning Johnson was in plain clothes and that Johnson was not, in fact, arrested at the conclusion of the questioning in the squad car. Id.

Similarly, in United States v. Plumman, the Eighth Circuit held that a suspect was not "in custody" when he was interviewed in a truck by two FBI

agents.  Plumman, 409 F.3d at 924-25.  Mr. Plumman sought to suppress his

statement "if they're saying that, it must have happened," when confronted

with allegations of sexual abuse of minors.  Id. at 923.  In affirming the district

court's denial of the motion to suppress, the Eighth Circuit noted that the

agents told the suspect he was not under arrest, he was free to leave, he could

stop talking at any time, and he would not be arrested at the close of the

interview.  Id. at 924.  One agent sat in the driver's seat and one agent sat in

the back seat while the suspect sat in the front passenger seat.  Id. at 925.  The

car was parked in a residential neighborhood during the daytime.  Id.  Neither

agent displayed his firearm.  Id.  The suspect made a taped "recap" statement

at the close of the three-hour interview.  Id.  Considering all of these facts, the

Eighth Circuit affirmed the magistrate's balancing of Griffin factors to find that

the suspect was not in custody.  Id.

This court likewise concludes that Mr. American Horse was not "in

custody" at the time of his June 21, 2012, interview and, thus, the officers

were not required to advise him of his Miranda warnings.  Key to this court's

conclusion is that Agent Dobberstein told Mr. American Horse explicitly that he

was not under arrest and would not be arrested that day–and indeed he was

not.  Agent Dobberstein also told Mr. American Horse that he did not have to

talk to the agents, that he could leave right away, or at any time during the

interview, and that he could refuse to answer specific questions even if he agreed to talk with the officers.

Furthermore, Mr. American Horse's door to the vehicle remained unlocked and with his window rolled down throughout the interview. He was in a residential area and passersby from the neighborhood came and went during the course of the interview, so Mr. American Horse was not isolated from the public. The <u>Berkemer</u> Court found this factor important in not requiring <u>Miranda</u> warnings for routine roadside questioning in connection with a traffic stop. The fact that the interrogation took place in public, subject to observation by pedestrians and other vehicles, reduces the ability of an unscrupulous policeman to "use illegitimate means to elicit self-incriminating statements and diminish[ing] the [subject's] fear that, if he does not cooperate, he will be subjected to abuse." <u>Berkemer</u>, 468 U.S. at 438.

The test is an objective one: would a reasonable person in Mr. American Horse's shoes have felt unable to leave? The court concludes that a reasonable person would have known he or she was free to leave: the officers told him that and there was an open and obvious means of egress immediately at hand. The court concludes that Mr. American Horse was not in custody at the time of his June 21, 2012, interview.

### 2. Whether the June 21, 2012, Statement was Voluntary

The Supreme Court has stated that, under the Due Process Clause of the Fifth and Fourteenth Amendments, "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." Miller v. Fenton, 474 U.S. 104, 109 (1985). "In considering whether a confession was voluntary, the determinative question is whether the confession was extracted by threats, violence, or promises (express or implied), such that the defendant's will was overborne and his or her capacity for self-determination was critically impaired." United States v. Pierce, 152 F.3d 808, 812 (8th Cir. 1998). The court must look to the totality of the circumstances, "including the conduct of the law enforcement officials and the defendant's capacity to resist any pressure." Id. See also Withrow v. Williams, 507 U.S. 680, 688-89 (1993) (continuing to adhere to the totality of circumstances test). The burden of demonstrating that a defendant's statement was voluntary rests with the government, which must prove voluntariness by at least a preponderance of the evidence. Missouri v. Seibert, 542 U.S. 600, 608 n.1 (2004).

The Supreme Court has made clear that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the

meaning of the Due Process Clause of the Fourteenth Amendment." [2] <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986). That is because a *prima facie* showing of a due process violation must include a showing of some sort of *state action*. <u>Id.</u> at 165. Therefore, a defendant's mental status alone can never result in a finding that his statement was involuntary without some form of police overreaching. <u>Id.</u>

However, this does not mean that a defendant's mental status is irrelevant to the question of whether his statement was voluntary. A defendant's mental status is still relevant, although not dispositive, under the totality of circumstances test to the extent the evidence shows that the police were aware of that mental status and acted in some way to exploit it. <u>See Blackburn v. Alabama</u>, 361 U.S. 199, 207-08 (1960) (defendant's statement involuntary where police were aware of defendant's history of mental problems, knew that he was "probably insane," and proceeded with interrogation); <u>United States v. Makes Room For Them</u>, 49 F.3d 410, 415 (8th Cir. 1995) (holding that totality of circumstances requires consideration of defendant's age, education, and experience insofar as police knew those facts). Where a defendant suffered from some mental infirmity and police were unaware of that infirmity, courts

---

[2] "Although <u>Connelly</u> arose under the Due Process Clause of the Fourteenth Amendment, whereas the instant case appears to implicate the Fifth Amendment, the analysis in the <u>Connelly</u> decision has been extended to apply to involuntary confession claims arising under the Fifth Amendment as well." <u>United States v. Bad Hand</u>, 926 F. Supp. 892, 899 n.10 (D.S.D. 1996).

have found the necessary state action to be missing.  See Connelly, 479 U.S. at

164-65; United States v. Rohrbach, 813 F.2d 142, 144-45 (8th Cir. 1987).

The existing precedent outlines the type of police conduct that courts

have found to be coercive.  The conduct includes extreme duration and

conditions of detention, the manifest attitude of police toward the defendant,

pressures which sap or sustain a defendant's powers of resistance or self-

control, and exploiting a defendant's mental and physical state.  See Spring,

479 U.S. at 574; Davis v. North Carolina, 384 U.S. 737, 739-53 (1966)

(defendant held for 16 days of incommunicado interrogation in a closed cell

without windows); Reck v. Pate, 367 U.S. 433, 436-44 (1961) (defendant held

for four days with inadequate food and medical attention until confession

obtained); Culombe v. Connecticut, 367 U.S. 568, 569-70, 621-25 (1961)

(defendant held for five days of repeated questioning during which police

employed coercive tactics); Ashcraft v. Tennessee, 322 U.S. 143, 153-55 (1944)

(defendant questioned by relays of officers for 36 hours without sleep).  It is

this body of law which the court applies to Mr. American Horse's assertion that

his statement was involuntary.

Based on the legal analysis of Connelly and its progeny, the court

considers all the facts and circumstances surrounding Mr. American Horse's

statement in determining whether that statement was voluntary.  See Withrow,

507 U.S. at 688-689; Arizona v. Fulminante, 499 U.S. 279, 285-86 (1991);

Fenton, 474 U.S. at 109-10; Plumman, 409 F.3d at 925 (holding that "recap" statement was voluntary when two FBI agents used "rapport-building" technique to interview suspect). In this context, the court also considers Mr. American Horse's personal characteristics to the extent they were known to the officers. Blackburn, 361 U.S. at 207-08; Makes Room For Them, 49 F.3d at 415; Jenner v. Smith, 982 F.2d 329, 333 (8th Cir. 1993). The court concludes that Mr. American Horse's June 21, 2012, statement was voluntary.

The court notes again the above facts that Mr. American Horse was told that he did not have to talk to the officers, that he could leave at any time, that he was not under arrest, and that his door was unlocked and his window remained open throughout the interview. Also, the duration of the interview at approximately one hour was not exceptional in any way. Mr. American Horse was not handcuffed or physically restrained in any way. No promises or threats were made nor did either agent curse or raise his voice to Mr. American Horse. He was never physically threatened. He was not isolated from other members of the public.

Much was made by the defendant at the hearing of Agent Baas's brief pat of Mr. American Horse's knee. The court finds that, in context, this was an act of compassion meant to comfort Mr. American Horse rather than a ploy designed to coerce him into confessing. No witness could pinpoint exactly when during the interview the patting of the knee took place–obviously if the

30

patting took place *after* Mr. American Horse made incriminating statements as to the sexual abuse, then the physical gesture was not a precipitating factor that coerced Mr. American Horse to confess.

Dr. Manlove testified to the "power imbalance" between the agents and Mr. American Horse as a result of their size differences, their race differences, and the fact that the interrogators were police. The Eighth Circuit has noted that "some degree of coercion is part and parcel of the interrogation process. . ." United States v. LeBrun, 363 F.3d 715, 721 (8th Cir. 2004). That does not mean that every interrogation is coercive. Here, the factors creating the "power imbalance" were immutable: the agents could neither change their physical size nor their race nor the fact that they were law enforcement officers. The law does not dictate that only Native American lay people may interrogate other Native Americans. The officers did what they could to ameliorate the power imbalance–they interviewed Mr. American Horse in his own setting rather than the police station and they did so in a low-key manner: they were in plain clothes, their weapons were hidden, their vehicle was unmarked, they used low voices, and the interview took place in full view of the passing public. The court concludes that, based on the totality of the circumstances, Mr. American Horse's June 21, 2012, statement was voluntary.

**B.    August 13, 2012, Statement**

**1.    Whether the <u>Miranda</u> Advisement was Complete & Accurate**

At the time Mr. American Horse made his second statement to law enforcement on August 13, 2012, he had been placed under arrest on the instant indictment.  He was clearly "in custody" and just as clearly, he was advised of his <u>Miranda</u> rights.  The government maintains that he also voluntarily and intelligently waived those rights.  Mr. American Horse first challenges the completeness and accuracy of the advisement of <u>Miranda</u> rights given to him.  He argues that the officers should have told him of the potential penalty he stood to face if he was convicted of the charge contained in the indictment.

"The four warnings <u>Miranda</u> requires are invariable, but this Court has not dictated the words in which the essential information must be conveyed." <u>Florida v. Powell</u>, 559 U.S. 50, ___, 130 S.Ct. 1195, 1204 (2010); <u>see</u> <u>California v. Prysock</u>, 453 U.S. 355, 359 (1981) (per curiam) (stating "[t]his Court has never indicated that the rigidity of <u>Miranda</u> extends to the precise formulation of the warnings given a criminal defendant.").  "In determining whether police officers adequately conveyed the four warnings, we have said, reviewing courts are not required to examine the words employed 'as if construing a will or defining the terms of an easement.  The inquiry is simply whether the warnings reasonably "conve[y] to [a suspect] his rights as required by <u>Miranda</u>." ' "

Powell, 559 U.S. at ___, 130 S.Ct. at 1204 (quoting Duckworth v. Eagan, 492 U.S. 195, 203 (1989) (quoting Prysock, 453 U.S. at 361)).

As the Powell Court noted, all "federal law enforcement agencies explicitly advise . . . suspect[s] of the full contours of each [Miranda] right, including the right to the presence of counsel during questioning." Powell, 559 U.S. at ___, 130 S. Ct. at 1206. The Court went on to state that, "[t]he standard warnings used by the Federal Bureau of Investigation are exemplary." Id. The Court cited to the FBI's advisement of the right to have an attorney present during interrogation and the right to have an attorney appointed for the suspect if he could not afford one and stated that the advisement was "admirably informative." Id. Here, the warning given by Agent Dobberstein is the very warning held up by the Supreme Court as commendably accurate and complete.

The Eighth Circuit has rejected the argument "that Miranda requires a specific warning on the potential sentencing consequences of waiving the right to remain silent." United States v. Johnson, 47 F.3d 272, 277 (8th Cir. 1995). However, in this case, Mr. American Horse's argument is defeated by his own actions–he demonstrated to the agents at their first meeting that he knew the crime of sexual abuse of a child could carry with it a substantial sentence because he informed the officers that his brother, Gerald, had been so convicted and had been given a 20-year penitentiary sentence. The Miranda

advisement given to Mr. American Horse contained all the warnings required by law.

### 2. Whether Mr. American Horse Validly Waived His Rights

It is the government's burden to prove that a defendant's waiver of his Miranda rights was voluntary, knowing, and intelligent. United States v. Caldwell, 954 F.2d 496, 505 (8th Cir. 1992). "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Miranda, 384 U.S. at 475. The government must prove waiver "at least by a preponderance of the evidence." Missouri v. Seibert, 542 U.S. 600, 608 n.1 (2004) (citing Connelly, 479 U.S. at 168).

Whether Mr. American Horse waived his Miranda rights requires two inquiries:

> [W]aiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

Berghuis v. Thompkins, ___ U.S. ___, 130 S. Ct. 2250, 2260 (2010) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).

A waiver of one's Miranda rights may be either express or implied. Berghuis, ___ U.S. ___, 130 S. Ct. at 2261 (citing North Carolina v. Butler, 441

34

U.S. 369, 372-76 (1979)).  An implied waiver occurs when the suspect embarks on a course of conduct indicating, given the totality of circumstances, waiver. Id.  The government must show that the suspect was advised of his Miranda rights, understood those rights, and then chose to make an uncoerced statement.  Id.  Simply proving that a Miranda advisement was given and that a statement was subsequently made is not sufficient.  Id.  Although the advisement itself is formalistic, the waiver need not be formalistic and the waiver need not comply with the procedures set out in Fed. R. Crim. P. 11 for waiver of an accused's rights to trial in open court during a plea proceeding. Id. at 2262.

"Only if the 'totality of circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived."  Burbine, 475 U.S. at 421.  Examination of the totality of circumstances includes, but is not limited to, such considerations as the "background, experience, and conduct" of the defendant.  United States v. Jones, 23 F.3d 1307, 1313 (8th Cir. 1994) (quoting United States v. Barahona, 990 F.2d 412, 418 (8th Cir. 1993)).

### a. Whether the Miranda Waiver was Voluntary

"Absent evidence that [defendant's] will [was] overborne and his capacity for self-determination critically impaired *because of* coercive police conduct," a

waiver of <u>Miranda</u> rights will be considered voluntary.  <u>Spring</u>, 479 U.S. at 574 (emphasis supplied).  There was no evidence presented to suggest that Agents Dobberstein and Baas coerced Mr. American Horse into speaking with them. There were no allegations of any police tactics which indicate the defendant's will was overborne or that his original decision to talk was due to police coercion.  The evidence presented at the hearing did not indicate that a 23-mile detour in a journey that would have been 133 miles long without the detour represented any coercive police conduct.

Although Mr. American Horse was in the Rushville jail for a DUI conviction, he had been there for 15 days and there is no evidence that he was still under the influence of alcohol on August 13, 2012, or that he was withdrawing from alcohol.  Due to a lack of coercive police conduct, Mr. American Horse's <u>Miranda</u> waiver was voluntary.

### b. Whether the <u>Miranda</u> Waiver was Knowing and Intelligent

"A waiver is 'knowing and intelligent' where it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the right . . . . " <u>Thai v. Mapes</u>, 412 F.3d 970, 977 (8th Cir. 2005).  Although police coercion is a necessary predicate to finding that a waiver was involuntary, it is *not* determinative on the separate issue of whether the waiver was knowing and intelligent.  <u>United States v. Turner</u>, 157 F.3d 552, 555 (8th Cir. 1998) (emphasis supplied).  "As a general

matter . . . an accused who is admonished with the warnings prescribed by this Court in <u>Miranda</u> has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one . . . ." <u>United States v. Garlewicz</u>, 493 F.3d 933, 936 (8th Cir. 2007) (internal citations omitted).

There is no evidence that Mr. American Horse unknowingly and involuntarily waived his <u>Miranda</u> rights. The psychological testing done of Mr. American Horse showed that he is of normal intelligence. He was able to understand and waive his confidentiality in the context of the interview with Dr. Manlove. He has had numerous experiences with the criminal justice system in his approximately 12 arrests and/or convictions for disorderly conduct and DUI. He was able to graduate from high school and to successfully complete a term of service in the Navy and obtain an honorable discharge. And his interactions with Dr. Manlove, and with the agents on the occasions of both of his interviews showed that he understood what was said to him and what he read and was able to respond appropriately. The court concludes that Mr. American Horse's waiver of his <u>Miranda</u> rights prior to the August 13, 2012, statement was voluntary, knowing, and intelligent.

### 3. Whether Mr. American Horse's Statement was Voluntary

The same law outlined above in connection with the June 21, 2012, statement also applies to Mr. American Horse's argument that his August 13, 2012, statement was involuntary. The court reaches the same conclusion and holds that the August 13, 2012, statement was also voluntary.

The court notes that, although in the second interview, Mr. American Horse *was* under arrest and *was* handcuffed, he was also fully advised of his Miranda rights. Those rights included an explicit advisement that Mr. American Horse could remain silent, could talk to a lawyer before making any statement, could have a lawyer with him before making a statement and during questioning, and that if he could not afford a lawyer, one would be appointed for him before any questioning. Thus, any coercion inherent in the fact that Mr. American Horse's second interview took place "in custody" was ameliorated by the giving of the Miranda advisement.

The Eighth Circuit reached a similar conclusion in United States v. Sanchez. United States v. Sanchez, 614 F.3d 876, 887 (8th Cir. 2010). In that case, the defendant was an immature sixteen-year-old easily influenced by others. Id. at 878-82. Officers interrogated him for twenty-six minutes and his mother joined in the interrogation. Id. The officers did advise both the defendant and his mother of Miranda rights and both signed waivers of those rights. Id. The defendant and his mother both testified that they understood

38

those rights before waiving them.  Id.  During the interrogation, the officers used tactics such a angry voices, intruding into defendant's personal space, suggesting that the assault victim's brother (who was known to be dangerous) may retaliate, telling defendant that he would go to jail, telling defendant that he would be charged with attempted murder, and showing defendant and his mother a graphic picture of the victim's injuries.  Id.  Even under the totality of these circumstances, the Eighth Circuit found that defendant's free will was not overborne and that his statement was voluntary.  See id. at 877-81, 882-88 (8th Cir. 2010).  Notably, the police tactics used in Sanchez differ from the FBI's "conversational" interview with Mr. American Horse in this case.

In Sanchez, the Eighth Circuit noted that "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was compelled despite the fact that law enforcement adhered to the dictates of Miranda are rare."  Id. at 883 (citing United States v. Astello, 241 F.3d 965, 966 (8th Cir. 2001)).  The court also noted that the officers' statements as to the potential charges against the defendant were not threats, and were not conditional on whether the defendant agreed to talk to the officers or not–they were simply "a truthful response" to the defendant's mother's question as to why her son would go to jail.  Id. at 884.  Likewise, the discussion of potential retaliation from the victim's brother was not a threat, but a truthful statement of something the officers hoped to avoid–and the officers did not make any

promises to try to protect defendant if he talked to them. Id. at 885. The Eighth Circuit, citing prior precedent, held that displaying a graphic photograph of the victim's injuries was "not inherently coercive police conduct" and did "not resemble the extreme conduct found to be improper in [other] cases." Id. at 885-86 (internal citations omitted). The court also noted that although the defendant's mother joined in the officers' interrogation of her son, she did not do so at the behest of the officers and, thus, she was not acting as a state actor. Id. at 886. Finally, although the court noted that the defendant was immature, it emphasized that he was of average intelligence and had met the requirements for graduation from high school at the age of sixteen and that he had been interrogated for only 26 minutes before confessing. Id. at 886-88.

Here, in addition to the factors already discussed above, the court notes that the interrogation of Mr. American Horse on August 13, 2012, lasted less than 15 minutes and he was advised fully of his Miranda rights. Given those facts, and the totality of the other facts present, the court concludes that the August 13, 2012, statement was voluntary.

## CONCLUSION

Based on the foregoing discussion, this court respectfully recommends that defendant George American Horse's motions to suppress [Docket Nos. 36 and 51] be denied in their entirety.

## NOTICE OF RIGHT TO APPEAL

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B), unless an extension of time for good cause is obtained. See FED. R. CRIM. P. 59(b); 28 U.S.C. § 636(b)(1)(B). Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Id. Objections must be timely and specific in order to require *de novo* review by the district court. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated May 15, 2013.

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE